# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| **Brianna Belk,**<br>**On behalf of herself and**<br>**All others similarly situated,** | **Case No. 1:18cv1954** |
| | |
| **Plaintiffs,** | **JUDGE PAMELA A. BARKER** |
| -vs- | |
| | |
| **Le Chaperon Rouge Co., et al.,** | **MEMORANDUM OPINION AND**<br>**ORDER** |
| **Defendants.** | |

Currently pending is the Motion of Plaintiffs Brianna Belk and Tiffany Morris to Enforce Settlement.  (Doc. No. 82.)  Defendants Le Chaperon Rouge Company and Stella Moga-Kennedy filed a Brief in Opposition and Supplemental Briefing, to which Plaintiffs responded.  (Doc. Nos. 83, 87, 88, 89.)  For the following reasons, Plaintiffs' Motion to Enforce Settlement (Doc. No. 82) is GRANTED IN PART and DENIED IN PART, as follows.

## I.    Background

On August 27, 2018, Plaintiffs Brianna Belk and Tiffany Morris, on behalf of themselves and all others similarly situated, filed a Complaint in this Court against Defendants Le Chaperon Rouge Company and Stella Moga-Kennedy, alleging violations of the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-291 and Ohio Revised Code § 4111.03.  (Doc. No. 1.) Therefore, Plaintiffs alleged that Defendant Le Chaperon Rouge operated child care facilities throughout northern Ohio that provided child care, development, and private elementary services for children ages six weeks through 12 years old.  (*Id*. at ¶¶ 10-11.)  Plaintiffs further alleged that Defendant Stella Moga-Kennedy was the owner, operator, and principal manager of Le Chaperon

1

Rouge.  (*Id*. at ¶ 9.)  Plaintiffs alleged that Defendants were "joint employers"[1] under the FLSA and, therefore, "responsible, both individually and jointly for compliance with all of the applicable provisions of the act, including the overtime provisions."  (*Id*. at ¶¶ 16-18.)

Plaintiffs worked for Le Chaperon Rouge at its Solon location.  (*Id*. at ¶¶ 13, 14.)  They alleged that Le Chaperon Rouge failed to pay them for all hours worked, including for work performed before and after their paid shifts.  (*Id*. at ¶¶ 21-24.)  Plaintiffs brought the instant action as both an FLSA collective action and a Rule 23 class action and sought to certify a class of "all full-time teachers for Le Chaperon Rouge who were subject to the company's clocking-in and clocking-out practices" during the relevant time periods.  (*Id*. at ¶¶ 29, 34.)

Defendants filed separate Answers on October 26, 2018.  (Doc. Nos. 7, 8.)  Then-assigned District Judge Donald Nugent conducted a Case Management Conference on November 29, 2018, at which conditional certification briefing deadlines were set.  (Doc. No. 11.)

On December 10, 2018, Plaintiffs filed a Motion for Conditional Certification and Court-Authorized Notice with respect to their FLSA claims.  (Doc. No. 13.)  Defendants filed a Brief in Opposition, to which Plaintiffs replied.  (Doc. Nos. 21, 25.)  On February 7, 2019, Judge Nugent granted Plaintiff's Motion in a non-document Order.  *See* Non-Document Order dated Feb. 7, 2019. Notice was issued pursuant to 29 U.S.C. § 216(b) and thirty-five opt-ins joined the case.  (Doc. Nos. 32-34, 43, 59-62.)

---

[1] In particular, Plaintiffs alleged that "Defendant Stella Moga-Kennedy was an 'employer' pursuant to 29 U.S.C. § 203(d) in that she was a 'person [who] act[ed] directly or indirectly in the interest of an employer,' Defendant Le Chaperon Rouge, 'in relation to employees,' including Plaintiffs, the Potential Opt-Ins, and the Ohio Class Members. As the owner, operator, and principal manager of Le Chaperon Rouge, Defendant Moga-Kennedy had operational control over significant aspects of the company's operations and day-to-day functions, including compensation of employees. Defendant Moga-Kennedy instituted or knowingly ratified the unlawful pay practices of the company described herein." (*Id*. at ¶ 16.)

2

The matter was re-assigned to the undersigned on July 5, 2019 pursuant to General Order 2019-13.  Plaintiffs thereafter brought several discovery disputes to the Court's attention, which were referred to and subsequently resolved by Magistrate Judge Jonathan Greenberg.  (Doc. Nos. 35, 40, 41, 57.)  On November 24, 2019, the Court referred the matter to Magistrate Judge Greenberg for mediation proceedings.  (Doc. No. 64.)

On January 31, 2020, Plaintiffs filed an Amended Class and Collective Action Complaint. (Doc. No. 71.)  In addition to alleging that Defendants failed to pay for work before and after paid shifts, Plaintiffs alleged in the Amended Complaint that Le Chaperon Rouge improperly required all teachers to attend "training without pay to maintain, for the benefit of the school and not mandated by any state law or rule, certain health certifications such as CPR, First Aid, Management of Communicable Disease, and Child Abuse Recognition and Prevention." (*Id*. at ¶ 24.)  The Amended Complaint asserted the following five claims: (1) FLSA Minimum Wage and Overtime Violations; (2) Ohio Overtime Violations; (3) Ohio Minimum Wage Violations; (4) Ohio Prompt Pay Act Violations; and (5) Ohio Record-Keeping Violations.  (*Id*. at ¶¶ 43-64.)  Plaintiffs sought compensatory damages, liquidated damages, costs, and attorney fees.  (*Id*. at p. 14.)

The following month, on February 25, 2020, Plaintiffs filed a Motion for Rule 23 Class Certification of State-Law Claims.  (Doc. No. 76.)

Shortly thereafter, on February 28, 2020, Magistrate Judge Greenberg conducted a mediation conference with counsel and parties.  (Doc. No. 77.)  The parties did not reach an agreement at that time but agreed to further mediation proceedings, which were set for March 12, 2020.  (*Id*.)

During this general time period, Governor Mike DeWine began taking action relating to the developing coronavirus pandemic or "COVID-19."  On March 9, 2020, Governor DeWine issued an Executive Order declaring a State of Emergency.  (Doc. No. 83-1.)  The next day, Governor DeWine

3

asked colleges and universities to use online learning and remote instruction, and recommended that spectators not attend any indoor sporting events.  (Doc. No. 82-9 at PageID#s 967-969, 976-979.)  On March 11, 2020, the World Health Organization ("WHO") declared a worldwide pandemic.  *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.  And, at 2:00 p.m. on March 12, 2020, Governor DeWine ordered all kindergarten through 12th grade schools in Ohio to close for several weeks.  *See* https://governor.ohio.gov/ wps/ portal/ gov/ governor/ media/ news-and- media/announces-school-closures. On that same date, Governor DeWine also issued an Executive Order authorizing emergency changes in child day care rules.[2]  (Doc. No. 83-3.)

On March 12, 2020, the parties participated in continued mediation proceedings before Magistrate Judge Greenberg.  (Doc. No. 79.)  A settlement was reached, the material terms of which were recited on the record.  (Doc. No. 81.)  Among other things, these terms included the following: (1) a total settlement payment of $200,000, to be paid 40 days after Court approval; (2) a release provision; (3) submission of a joint motion for approval of settlement and proposed notice to settlement class members by no later than April 10, 2020; (4) proposed service awards to the named Plaintiffs; and (5) issuance of individual settlement checks and tax forms by Defendants to the Settlement Class Members after final approval.  (*Id*.)  The parties also agreed that the Court would retain jurisdiction to enforce the terms of the settlement agreement.  (*Id*. at p. 10.)  Magistrate Judge

---

[2] The next day, the Ohio Department of Jobs and Family Services ("ODJFS") issued emergency child day care rules.  On March 14, 2020, Governor DeWine issued an Executive Order establishing a "temporary pandemic child care license" during the declared state of emergency.  Regulations relating to temporary pandemic child day care licenses were issued on March 18, 2020.  On March 23, 2020, the Ohio Department of Health ("ODH") issued a stay-at-home order.  On March 25, 2020, the ODH issued an order requiring all child day care centers to close absent a temporary pandemic child day care license.  *See* Doc. Nos. 83-3 through 83-8.

Greenberg then issued an Order reporting that the parties were able to resolve their differences and ordering that a Motion to Approve Settlement be filed no later than April 10, 2020.  (Doc. No. 79.)

Plaintiffs submitted a draft settlement agreement to Defendants on March 19, 2020, as well as supplemental materials (including a joint motion for approval of settlement, proposed notice, class roster, and proposed preliminary order approving the joint motion) on March 23, 2020.  (Doc. Nos. 82-3 through 82-8.)  When he did not receive a response, Plaintiffs' counsel emailed defense counsel to remind him that the deadline to file the Joint Motion for Approval was April 10, 2020.   (Doc. No. 82-3 at PageID# 912.)

On March 31, 2020, defense counsel emailed counsel for Plaintiffs as follows: "We will never meet that deadline.  My client is totally shut down [due to the coronavirus pandemic]. We need to discuss how to deal with this.  This is having major financial repercussions."  (Doc. No. 82-3 at PageID# 913.)  Ultimately, Defendants failed to execute the Settlement Agreement, citing financial constraints imposed by the pandemic and Executive Orders issued by the State of Ohio impacting Le Chaperon Rouge's child care centers and private elementary school.

On April 11, 2020, Plaintiffs filed a Motion to Enforce.  (Doc. No. 82.)  Therein, Plaintiffs asked the Court to (1) enforce the parties' settlement agreement; (2) approve the settlement of federal wage-and-hour claims pursuant to the FLSA; (3) certify a proposed Settlement Class under Fed. R. Civ. P. 23; (4) preliminarily approve the proposed settlement of the state law wage-and-hour claims for Settlement Class Members; (5) approve a proposed Notice to Settlement Class Members; and (6) schedule a Fairness Hearing.  (*Id*.)

Defendants filed a Brief in Opposition on April 27, 2020, in which they acknowledged that a "global settlement" was reached on March 12, 2020 and that the terms of that settlement included a means "intended to lead to approval of a class settlement."  (Doc. No. 83 at p. 1.)  Defendants argued,

however, that "unforeseen events have arisen – specifically, the state-mandated closure of its entire business enterprise and the concomitant economic catastrophe which has resulted—which renders the settlement unenforceable under Ohio law." (*Id*.)

The Court conducted a telephonic status conference with counsel on April 27, 2020.  (Doc. No. 84.)  During that conference, Defendants argued, for the first time, that the settlement was agreed to by Defendant Le Chaperon Rouge only and not by Defendant Moga-Kennedy personally.  (*Id*.) The Court ordered Defendants to submit a detailed declaration setting forth support for their argument regarding Defendant Moga-Kennedy's personal liability, as well as for the financial assertions set forth in their Brief in Opposition regarding Defendant Le Chaperon Rouge's alleged inability to pay the agreed-upon settlement amount.  (*Id*.)

On May 18, 2020, Defendants filed, under seal, the Declaration of Stella Moga-Kennedy, as well as numerous financial documents as attachments and exhibits thereto.  (Doc. No. 87.)  On that same date, Defendants also filed Supplemental Briefing regarding the issue of whether the parties' settlement agreement was reached with Defendant Moga-Kennedy personally.  (Doc. No. 88.) Therein, Defendants requested that the Court conduct a hearing, both as to (1) Defendant Le Chaperon Rouge's alleged financial inability to perform the agreement in light of the coronavirus pandemic, and (2) whether Defendant Kennedy had agreed to be personally liable for payment of the settlement amount under the terms of the parties' agreement.  (*Id*.)

Plaintiffs filed a Reply Brief in support of their Motion to Enforce Settlement on May 26, 2020, in which they argued that a hearing was unnecessary and the Court should enforce the settlement agreement as to both Defendants Le Chaperon Rouge and Moga-Kennedy in her individual capacity.  (Doc. No. 89.)

## II.    Analysis

As set forth above, in their Motion, Plaintiffs ask this Court to enforce the parties' Settlement Agreement, approve the parties' proposed FLSA collective action settlement, certify the Rule 23 class, preliminarily approve the proposed Rule 23 class settlement, approve notice to settlement class members, and schedule a Fairness Hearing.  (Doc. No. 82.)  The Court will address each of these requests separately below, beginning with the Plaintiffs' request that the Court enforce the parties' settlement agreement.

### A.    Motion to Enforce Settlement Agreement

"Before enforcing a settlement, a district court must conclude that agreement has been reached on all material terms." *RE/MAX Int'l, Inc. v. Realty One, Inc*., 271 F.3d 633, 645-46 (6th Cir. 2001). In assessing whether an agreement has been reached, federal courts have recognized that "[s]ettlement agreements are a type of contract subject to principles of state contract law."  *Reed v. Wehrmann*, 159 F. Supp. 2d 700, 704 (S.D. Ohio 2001); *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992) ("Thus, '[w]hether [a settlement agreement] is a valid contract between the parties is determined by reference to state substantive law governing contracts generally.'") (quoting *White Farm Equip. Co. v. Kupcho*, 792 F.2d 526, 529 (5th Cir. 1986)).  In this case, the parties do not dispute that Ohio law governs their dispute over whether they entered into an enforceable settlement agreement.  *See* Doc. No. 83 at p.2; Doc. No. 89 at pp. 1-4.

In Ohio, a settlement agreement, like any other contract, requires "a meeting of the minds as well as an offer and an acceptance thereof."  *Rulli v. Fan Co*., 79 Ohio St.3d 374, 376 (1997); *see also Spoerke v. Abruzzo*, 2014 WL 1350143 at *5 (Ohio Ct. App. 11th Dist. Mar. 31, 2014) ("To constitute a valid contract, there must be an offer on the one side and an acceptance on the other resulting in a meeting of the minds of the parties.").  "[S]ettlement agreements are highly favored in

the law." *Cont'l W. Condo. Unit Owners Ass'n v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502 (1996). However, "courts should be particularly reluctant to enforce ambiguous or incomplete contracts that aim to memorialize a settlement agreement between adversarial litigants." *Rulli,* 79 Ohio St.3d at 376.

Here, Plaintiffs argue that the parties reached a global settlement agreement as to all material terms on March 12, 2020 and that the agreement should be enforced as to both Defendants Le Chaperon Rouge and Stella Moga-Kennedy.  (Doc. Nos. 82, 89.)  Defendants do not dispute that Le Chaperon Rouge entered into a settlement agreement with Plaintiffs but argue that Moga-Kennedy assumed no obligation to guarantee or assume joint and several liability for payment of the settlement amount. (Doc. No. 88.)  Defendants further assert that, with respect to Le Chaperon Rouge, the settlement agreement is not enforceable under Ohio law due to impossibility of performance.  (Doc. No. 83.)  The Court will address each of these arguments in turn.

### 1.  Defendant Moga-Kennedy's Personal Liability

Defendants acknowledge that "[a]s a 'corporate officer with operational control of a corporation's covered enterprise,' Stella Moga-Kennedy was an 'employer along with [Le Chaperon Rouge who was] jointly and severally liable under the FLSA for unpaid wages.'"  (Doc. No. 88 at p.3.)  However, Defendants argue that the fact that Moga-Kennedy could have been held liable had the Plaintiffs prevailed at trial, does not mean that she agreed to guarantee Le Chaperon Rouge's settlement obligations or to otherwise be jointly and severally liable for the agreed-upon settlement payment.  (*Id.*)  To the contrary, Defendant Moga-Kennedy submits a Declaration in which she avers as follows:

> I was present for all of the negotiations that led to the $200,000.00 settlement on March 12, 2020.  I never agreed to, nor was asked to agree to, guarantee or be separately liable, whether jointly or severally, with Le Chaperon Rouge to pay the

settlement.  In fact, I understood that the settlement was solely between the Plaintiff class and Le Chaperon Rouge.

(Doc. No. 87 at ¶ 38.)

Plaintiffs argue that "Stella Moga-Kennedy's argument that she bears no personal liability on the parties' settlement squarely contradicts Ohio law and the settlement terms expressed on the record in open court." (Doc. No. 89 at p. 1.)  They note that, under Ohio law, an obligation entered into by more than one person is presumed to be joint, absent contractual language to the contrary.  (*Id*., citing *Spicer v. James*, 487 N.E.2d 343, 354-355 (Ohio App. 2nd Dist. 1985) *and Pinzone v. Pinzone*, 2012 WL 6727339 at * 3 (Ohio App. 11th Dist. Dec. 24, 2012)).  Despite this well-settled law, Plaintiffs assert that "not once during the parties' transcribed on-the-record recitation of settlement terms did Defendants attempt to sever [Moga-Kennedy] from responsibility under the settlement, or even raise it as a proposed material term for negotiation." (*Id*. at p. 2.)  Plaintiffs further note that, after they submitted a draft Settlement Agreement to defense counsel that expressly stated that "*Defendants* will pay the total settlement amount of [] $200,000," Defendants did not object or otherwise take the position that Moga-Kennedy had not agreed to be personally liable. (*Id*. at p. 8) (emphasis added).  In light of the above, Plaintiffs argue that Defendant Moga-Kennedy cannot now attempt to evade joint and several liability.

For the following reasons, the Court agrees with Plaintiffs.  Under Ohio law, "if a corporate officer executes an agreement in a way that indicates personal liability, then that officer is personally liable regardless of his intention." *Spicer*, 487 N.E.2d at 354.  Whether an officer or agent is personally liable under the contract depends upon "the form of the promise and the form of the signature." *Id.  See Co. Wrench, Ltd. v. Moran*, 2016 WL 4724209 at * 3 (Ohio App. 5th Dist. Aug. 31, 2016); *Sutter v. Henkle,* 2016 WL 1090466 at * 7 (Ohio App. 3rd Dist. March 21, 2016).  "If the

contractual language does not expressly state the nature of a party's liability, it will be presumed that co-signers of the agreement are jointly and severally liable for the underlying debt." *Pinzone*, 2012 WL 6727339 at * 3. *See also Interstate Gas Supply, Inc. v. Calex Corp.*, 2006 WL 328679 at * 11 (Ohio App. 10th Dist. Feb. 14, 2006).

Here, the material terms of the parties' settlement agreement were placed on the record at the conclusion of mediation proceedings before Magistrate Judge Greenberg on March 12, 2020. [3] At the outset, defense counsel introduced himself as counsel for both Defendant Le Chaperon Rouge and Defendant Moga-Kennedy, who he referred to as "a named defendant and the principal of Le Chaperon Rouge." (Doc. No. 81 at p. 3.) The record reflects that, throughout the recital of the settlement terms, the parties to the agreement were identified as "the plaintiffs" and "the defendants," without differentiation between Defendant Le Chaperon Rouge and Defendant Moga-Kennedy. For example, the transcript reflects the parties agreed that "the plaintiffs will submit a draft to the defendants of the settlement documents within seven days from now" and "defendants will respond with edits, whatever, within seven days." (*Id*. at p. 6.) The parties further stated that "the defendants will issue [individual settlement] checks and issue the tax documents associated with them." (*Id*. at p. 7.) Again, later, the parties agreed that "the defendants will issue those checks" and "the defendants will be responsible for the employer portion of payroll and FICA taxes." (*Id*. at pp. 9-10.)

At the conclusion of the recital, Magistrate Judge Greenberg engaged in the following colloquy with defense counsel, Brent English, and Defendant Moga-Kennedy:

---

[3] The fact that the parties' settlement agreement has not yet been formalized in writing is immaterial. As the Sixth Circuit has explained, "[t]he existence of a valid agreement is not diminished by the fact that the parties have yet to memorialize the agreement. When the parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement." *RE/MAX Intern., Inc.,* 271 F.3d at 646.

THE COURT: Okay. And anything further, Mr. English, as it relates to the material terms?

MR. ENGLISH: Nothing else.

***

THE COURT: Very well. Ms. Moga, good afternoon.

MS. MOGA-KENNEDY: Good afternoon.

THE COURT: Did you hear the material terms that were read by [Plaintiffs' counsel] Mr. Downie –

MS. MOGA-KENNEDY: Yes.

THE COURT: -- and agreed to by your attorney, Mr. English?

MS. MOGA-KENNEDY: Yes.

THE COURT: Do you understand them?

MS. MOGA-KENNEDY: Yes.

THE COURT: And do you agree with them?

MS. MOGA-KENNEDY: Mm-hmm.

MR. ENGLISH: Yes. Say "yes."

MS. MOGA-KENNEDY: Yes.

THE COURT: Very well. Anything further on behalf of the plaintiffs?

MR. DOWNIE: No, Your Honor.

THE COURT: Anything further on behalf of the defendants?

MR. ENGLISH: No.

(*Id.* at pp. 10-12.)  At no point did either defense counsel or Defendant Moga-Kennedy indicate that she had not agreed to be jointly and severally liable for the settlement payment or that she otherwise had not consented to be a signatory to the parties' settlement agreement in her individual capacity.

11

On March 19, 2020, Plaintiffs' counsel emailed a copy of a draft Settlement Agreement to defense counsel. (Doc. No. 82-3 at PageID# 907). This draft Agreement states that it is entered into between Plaintiffs Belk and Morris and the Proposed Settlement Class, and "Defendants Le Chaperon Rouge and Stella Moga-Kennedy." (Doc. No. 82-4 at PageID# 919.) In the definitions section, the term "Defendants" is defined as "Le Chaperon Rouge and Stella Moga-Kennedy," and the term "parties" is defined as "the Plaintiffs and Defendants, as defined herein." (*Id.* at PageID# 920.) The draft Agreement then provides (among other things) that "Defendants will pay the Total Settlement Amount of Two Hundred Thousand Dollars ($200,000) in full and final settlement of claims as provided herein." (*Id.* at PageID#922.) The signature section contains two signature lines for Defendants; the first for a representative of Le Chaperon Rouge Company, and the second for Defendant Stella Moga-Kennedy. (*Id.* at PageID#929.)

In subsequent emails to Plaintiffs' counsel, defense counsel did not indicate (or even suggest) that Defendant Moga-Kennedy had not agreed to be jointly and severally liable for the settlement payment. Rather, the only stated basis for Defendants' objection to finalizing the agreement was the "major financial repercussions" of the coronavirus pandemic. (Doc. No. 82-3 at PageID# 913, 916.) Additionally, Defendants did not raise the argument that Moga-Kennedy was not personally liable in their Brief in Opposition to Plaintiffs' Motion to Enforce. (Doc. No. 83.) The first time Defendants raised this argument was during the April 27, 2020 status conference with the Court, when defense counsel orally asserted that Moga-Kennedy had not agreed to joint and several liability. (Doc. No. 84.)

For the following reasons, the Court finds that the parties' oral settlement agreement unambiguously provides for joint and several liability for all Defendants. As noted above, Defendants acknowledge that as a "corporate officer with operational control of a corporation's covered

enterprise," Defendant Moga-Kennedy is considered an "employer" under the FLSA and, therefore, jointly and severally liable under that statute for unpaid wages. (Doc. No. 88 at p.3.) Moreover, Defendants do not dispute that Ohio law provides that "an obligation entered into by more than one person is presumed to be joint, and several responsibility will not arise except by words of severance." *Spicer,* 487 N.E.2d at 354-355. *See also Pinzone*, 2012 WL 6727339 at * 3; *Interstate Gas Supply, Inc.*, 2006 WL 328679 at * 11. Given this legal backdrop, if Defendant Moga-Kennedy did not intend to assume joint and several liability for the settlement payment, it was incumbent on her to clearly articulate this as a material term of the parties' agreement. Defendant Moga-Kennedy was represented by counsel throughout these proceedings and the record reflects that Magistrate Judge Greenberg provided multiple opportunities for both her and her counsel to raise any additional material terms during the recital of the terms of parties' agreement on March 12, 2020. As set forth above, the transcript reflects that neither Defendant Moga-Kennedy nor her counsel raised this issue when provided the opportunity to do so and, instead, explicitly voiced agreement with the terms as recited by plaintiffs' counsel.[4] (Doc. No. 81.)

Federal courts in other circuits have found that individual defendants agreed to joint and several liability under similar circumstances. For example, in *Herrera v. Eastside Wok*, 2014 WL 6678281 (S.D. N.Y. Nov. 25, 2014), plaintiffs brought a wage-and-hour action against Eastside Wok and its principals Kevin Cohnen and Choon Soo Ho. The parties appeared for a settlement conference before the Court, at which a settlement was reached and the material terms were memorialized on the record. *Id*. at *1. After the material terms were stated, the Court asked each party whether he

---

[4] Notably, Defendants do not assert that the issue of Defendant Moga-Kennedy's personal liability was discussed as an element of the parties' settlement at any point during the course of the parties' mediation proceedings, on either February 28, 2020 or March 12, 2020.

understood the terms and agreed to be bound.  *Id.*  Both Defendants Cohnen and Ho responded in the affirmative.  *Id*. at *2.  Later, discussions broke down over a disagreement regarding the individual liability of the defendants, with plaintiffs asserting that all defendants were jointly and severally liable and defendants arguing that only Eastside Wok was responsible for payment of the settlement amount.  *Id*. at * 1-2.

Plaintiffs filed a motion to enforce settlement, in which they argued that Defendants Cohnen and Ho should be found to have agreed to joint and several liability.  The district court granted the motion, explaining as follows:

> Despite this fundamental disagreement between the parties, the Court finds that the settlement agreement unambiguously provides for joint and several liability for all defendants. *Lemus v. Manhattan Car Wash, Inc.,* No. 06–CV–15486 (MHD), 2010 WL 1372705 (S.D.N.Y. Mar. 26, 2010) is on point. In *Lemus*, one of the defendants in a FLSA case contested his liability where the written settlement agreement did not explicitly provide for joint and several liability, only that "defendants" were responsible for paying the settlement amount to plaintiffs. In rejecting the defendant's interpretation, the court observed that "New York law is clear that when multiple promisors agree to pay a stated sum to the same promisee, they will be jointly liable unless the promisors unambiguously expressed a contrary intention." *Lemus,* 2010 WL 1372705, at *7 & n.15 (collecting cases). *** Similarly, courts have explained that "[i]f the transaction takes the form of a single contract and the promisors so express themselves as to lead the promisee reasonably to understand that each one promises the whole compensation, they are all bound accordingly." *NYKCool A.B. v. Pac. Fruit Inc.,* No. 10–CV–3867 (LAK)(AJP), 2011 WL 3666579, at *3 (S.D.N.Y. Aug. 9, 2011) (quoting 9 Corbin on Contracts § 52.4 (rev. ed.2007)), aff'd, 507 F. App'x 83 (2d Cir.2013).
>
> In light of this well-established principle of New York contract law governing joint and several liability, defendants' interpretation of the agreement set forth on the record is not "sufficiently reasonable to render [it] ambiguous." *In re Delta Air Lines, Inc*., 313 F. App'x at 434. For the same reason, defendants' argument that plaintiffs improperly seek to add joint and several liability to the agreement is unavailing. See Defs. Mem. at 4–5. Rather it is defendants who are attempting to modify the oral agreement by advocating for their several liability in a manner contrary to principles of New York contract law. **Given that Cohnen and Ho each stated that he intended to be bound by the obligations that had just been elucidated on the record, joint and several liability is the only reasonable interpretation. If defendants had contemplated that only Eastside Wok would be responsible for making the**

> **settlement payment to plaintiffs in exchange for all defendants being released from liability for the suit, such an arrangement should have been made explicit with "words of severance,"** *Wujin Nanxiashu Secant Factory*, **802 N.Y.S.2d at 414, and it was not, even though the Court twice invited counsel to place any other terms on the record**, **Tr. at 11, 15**.

*Id*. at *3 (emphasis added). *Herrera* is all on fours with the instant case and, given the similarities between New York and Ohio contract law regarding joint and several liability, supports the Court's finding herein that the parties' settlement agreement is enforceable against Defendant Moga-Kennedy with respect to the issue of joint and several liability.

Defendant Moga-Kennedy's Declaration that she "never agreed to" joint and several liability and "in fact, understood that the settlement was solely between the Plaintiff class and Le Chaperon Rouge," does not require a different result. (Doc. No. 87 at ¶ 38.) Under Ohio law, a meeting of the minds occurs where "'a reasonable person would find that the parties manifested a present intention to be bound to an agreement.'" *Champion Gym & Fitness, Inc. v. Crotty*, 900 N.E.2d 231, 235 (Ohio App. 2d Dist. 2008) (quoting *Zelina v. Hillyer*, 846 N.E.2d 68, 70 (Ohio App. 9th Dist. 2005). Thus, courts will only consider objective manifestations of intent. *See e.g., Altercare of Mayfield Village Inc. v. Berner*, 86 N.E.3d 649, 657 (Ohio App. 8th Dist. 2017); *Nilavar v. Osborn*, 711 N.E.2d 726, 733 (Ohio App. 2d Dist.1998). As summarized by the Sixth Circuit:

> Ohio law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time. What it does require is that the terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous.

*216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co*., 540 F.3d 433, 440 (6th Cir.2008) (citing *Nilavar*, 711 N.E.2d at 733). *See also Bruzzese v. Chesapeake Exploration, Inc*., 998 F.Supp.2d 663, 673 (S.D. Ohio 2014); *Bennett v. Heidinger,* 507 N.E.2d 1162, 1164 (Ohio App. 8th Dist. 1986) ("The

relevant inquiry is the manifestation of intent of the parties as seen through the eyes of a reasonable observer, rather than the subjective intention of the parties.").

Here, given well-settled Ohio law that an obligation entered into by more than one person is presumed to be joint absent language to the contrary, the Court finds that Plaintiffs reasonably believed that Defendant Moga-Kennedy agreed to be jointly and severally liable when neither she or her counsel stated otherwise despite ample opportunity to do so.  Accordingly, the Court finds that the terms of the parties' settlement agreement "establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous." *See 216 Jamaica Avenue, LLC*, 540 F.3d 433, 440.

The Court further finds that an evidentiary hearing is not necessary.  "Ordinarily, an evidentiary hearing is required where facts material to an agreement are disputed." *RE/MAX*, 271 F.3d at 646. "However, no evidentiary hearing is required where an agreement is clear and unambiguous and no issue of fact is present."  *Id.  See also Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976) (affirming summary enforcement of settlement agreement when "no fact issue was present," the terms of the agreement were clear and unambiguous, and enforcement "was determinable solely as a matter of law"); *Reed*, 159 F. Supp. 2d at 703 ("[T]his case involves a purely legal question, i.e., did Plaintiff's response constitute a valid acceptance, resolution of which would not be aided by a plenary hearing.").  Here, there is no dispute over the content of the parties' communications or other factual issue necessitating a hearing.  Indeed, the material terms of the settlement were recited on the record and all parties agreed to those terms.  Rather, the only issue relates to Defendant Moga-Kennedy's personal liability under the parties' agreement and that issue is determinable solely as a matter of law, as discussed above.  Accordingly, an evidentiary hearing would not aid the Court in its decision, and Defendants' request for a hearing is denied.

Therefore, and for all the reasons set forth above, the Court finds that Defendant Moga-Kennedy assumed joint and several liability for payment of the total settlement amount pursuant to the parties' settlement agreement.

### 2.    Impossibility of Performance

Defendants next argue that the parties' settlement agreement is unenforceable under the Ohio contract law doctrine of impossibility. (Doc. No. 83.) Defendants maintain that, when the settlement was reached on March 12, 2020, "the impending COVID-19 pandemic was just emerging, and the consequent business crisis had not occurred." (*Id*. at p. 6.) Prior to the pandemic, Le Chaperon Rouge operated 11 child day care centers and one private elementary school in Northeast Ohio. (Doc. No. 87 at ¶¶ 3,4.) It had 232 full-time employees, and approximately 1,174 children enrolled at its facilities. (*Id*. at ¶¶ 6, 13.) Defendants maintain that, prior to the pandemic, it was in a financial position to fund the settlement payment agreed to on March 12, 2020. (Doc. No. 83 at p. 6.)

However, on March 25, 2020 (thirteen days after the settlement was reached), the State of Ohio ordered all child day care centers to close, causing significant disruption to Le Chaperon Rouge's business. (Doc. No. 83 at pp. 6-7.) Defendants assert that Le Chaperon Rouge had to lay off all its employees and had only 76 children in its care when it closed its doors pursuant to Governor DeWine's March 25, 2020 Order. (Doc. No. 87 at ¶¶ 6, 13.) Although child day centers have since been permitted to re-open, Defendant Moga-Kennedy avers that mandatory practices imposed by the State of Ohio regarding reduced staff to child ratios and maximum group size limitations have "wreaked havoc on Le Chaperon Rouge's income and ability to pay the settlement in this case."[5] (*Id.*

---

[5] Defendant Moga-Kennedy states that "as a result of new mandatory obligations imposed by the State of Ohio for childcare centers, I estimate that the maximum number of children [that] can be enrolled at the 11 childcare centers is 534 children." (*Id*. at ¶ 14.)

at ¶¶ 10-17.)  Specifically, Defendant Moga-Kennedy states in her Declaration that (1) Le Chaperon Rouge has insufficient cash on hand to fund the settlement; (2) the real properties owned by Le Chaperon Rouge and Ms. Moga-Kennedy are heavily mortgaged; (3) Moga-Kennedy applied for a line of credit to assist in paying for the settlement but was denied; and (4) Moga-Kennedy had to significantly mortgage her home and other properties she owns in order to pay taxes owed as a result of a 2018 IRS Audit.  (*Id.* at ¶¶ 21-32.)  She also avers as follows:

> 39.  When I settled the case, I was unaware that the governmental response to COVID-19 was about to occur and that it would severely impact Le Chaperon's business.

> 40.  It is not possible for Le Chaperon Rouge to pay the settlement. The complete shutdown of the business for an extended duration and the corresponding public health emergency that necessitated the closure which affects the very core of my business was unforeseen and could not have been foreseen. I have gone from a healthy business which I built over 30 years where I employed more than 225 people and cared for nearly 1,200 children every day, to a business which cannot pay its bills, has no income, and has very limited prospects of recovery.  It is not merely burdensome or difficult for Le Chaperon Rouge to pay the funds required by the settlement, it is impossible.

(*Id.* at ¶¶ 39, 40.)  Defendants did not submit a Declaration or financial documentation regarding Moga-Kennedy's financial ability to fund the settlement amount on the grounds that such information is not "presently relevant" because "Moga-Kennedy has no personal liability for Le Chaperon Rouge's obligations."  (Doc. No. 88 at p. 4) ("Because Stella Moga-Kennedy has no personal liability for Le Chaperon Rouge's obligations, we have not addressed her personal assets other than her ownership of, income from Le Chaperon Rouge and payment of obligations for the benefit of Le Chaperon Rouge, in her declaration, nor have we provided opposing counsel with her personal financial records since they are not presently relevant.")

In response, Plaintiffs argue that Le Chaperon Rouge's asserted inability to pay due to financial difficulty does not constitute an excuse because, under Ohio law, "a party generally assumes

the risk of financial ability to perform when entering into any contract." (Doc. No. 89 at p. 2) (collecting cases).  Plaintiffs further complain that Defendants failed to submit any evidence regarding Moga-Kennedy's assets, arguing as follows:

> The omission is a telling one—Moga-Kennedy is well able to pay, or at least finance, the $200,000 settlement.  She selectively recites the $153,000 annually that she and her husband earn in W-2 wages from Le Chaperon Rouge, but slips under the radar the roughly $1,065,076.20 she evidently pocketed in 2019, while this case was pending and in a potential settlement posture, paid by Le Chaperon Rouge to her in rents as the owner of the properties occupied by her schools. *See* Moga-Kennedy Declaration, at ECF #87, ¶¶ 25-26 ***. She had sufficient resources to purchase outright, and later finance, a home in Beverly Hills for her granddaughter, one of *six* homes she owns. *Id*. at ¶ 32. She had sufficient assets to finance a [multi]-million loan to cover her company's tax debt. *Id*. at ¶ 29. Defendants included these selective disclosures regarding Moga-Kennedy, evidently to show that she carries some debts. What these selective disclosures actually demonstrate is an unmistakable ability to cover short- and long-term obligations—many much larger than the settlement amount here.

(*Id*. at p. 9-10.)  Finally, Plaintiffs argue that Defendants could have sought inclusion of a *force majeure* provision during the March 12, 2020 mediation conference.  (*Id*. at pp. 11-12.)  They maintain that Defendants failed to do so and cannot retroactively insert such a provision in the parties' agreement now.  (*Id*.)

Defendants did not seek leave to file a sur-reply to address Plaintiffs' arguments.

Impossibility of performance is an affirmative defense to a breach of contract claim.  *See Skilton v. Perry Local School District Board of Education*, 2002 WL 31744700 at * 5 (Ohio App. 11th Dist. Dec. 6, 2002).  Under Ohio law, impossibility of performance occurs where, after the contract is entered into, an unforeseen event arises rendering impossible the performance of one of the contracting parties. *Id. See also Truetried Serv. Co. v. Hager*, 691 N.E.2d 1112,1118 (Ohio App. 8th Dist. 1997). A contracting party "'will not be excused from performance merely because performance may provide difficult, dangerous, or burdensome.'"  *Leon v. State Farm Fire and*

19

*Casualty Co.*, 98 N.E.3d 1284, 1289 (Ohio App. 8th Dist. 2017) (quoting *Truetried,* 118 Ohio App.3d at 87).   Rather, the performance must be rendered impossible without fault of the party asserting the defense and where the difficulties could not have been reasonably foreseen.  *See Skilton*, 2002 WL 31744700 at * 5.  "A party who raises the impossibility defense bears the burden of proving it." *Hosea Project Movers, LLC v. Waterfront Associates, Inc.*, 2017 WL 3034643 at * 13 (S.D. Ohio July 14, 2017) (citing *State ex rel. DeWine v. Washington C.H.*, 18 N.E.3d 448, 455 (Ohio App. 12th Dist. 2014)).

The Court finds that Defendants have failed to demonstrate that performance of the parties' settlement agreement should be excused based on the contractual defense of impossibility.  As an initial matter, the Court is not convinced that the financial difficulties posed by COVID-19 "could not have been reasonably foreseen" when the parties reached a settlement on March 12, 2020.   In the days leading up to the parties' settlement conference, Governor DeWine declared a State of Emergency in Ohio; asked colleges and universities to shift to online learning and remote instruction; and recommended that spectators not attend any indoor sporting events, all due to alarming developments relating to the spread of COVID-19.[6]  (Doc. Nos. 83-1, 82-9.)  Governor DeWine's actions were well publicized at the time and news coverage regarding the coronavirus was widespread.  On March 12, 2020 (the day the parties reached their settlement agreement), Governor DeWine (1) issued an Executive Order that authorized "emergency changes in child day care rules to respond to the public health crisis of the pandemic COVID-19," and (2) closed all kindergarten through twelfth grade schools until April 3, 2020.

---

[6] The World Health Organization declared COVID-19 a public health emergency in January 2020, and elevated that designation to a "worldwide pandemic" on March 11, 2020.

Defendant Moga-Kennedy avers that she was "unaware that the governmental response to COVID-19 was about to occur and that it would severely impact Le Chaperon's business." (Doc. No. 87 at ¶ 39.) In their Brief in Opposition, however, Defendants acknowledge that they were aware on March 12, 2020 that Governor DeWine had ordered all kindergarten through twelfth grade schools closed until April 3, 2020. *See* Doc. No. 83 at p. 4 ("[T]he only thing that was known at that time [i.e., during the March 12, 2020 mediation proceedings] was that Governor DeWine just that day had ordered public schools closed until early April 2020.") Governor DeWine's order directly impacted Defendants' private elementary school and should, at the very least, have caused Defendants to consider the possibility that its child day care centers could also soon be negatively impacted by the COVID-19 pandemic as well. Accordingly, the Court finds that the defense of impossibility is not available to Defendants because it was reasonably foreseeable on March 12, 2020 that COVID-19 could have a significant negative impact on Defendants' business operations and financial ability to fund the settlement payment.[7]

Moreover, even assuming the financial impact of COVID-19 was not reasonably foreseeable on March 12, 2020, the Court finds that Defendants have failed to carry their burden of demonstrating that it is impossible for Defendant Moga-Kennedy to fund the settlement payment. Although provided the opportunity to do so, Defendants failed to submit a Declaration and/or documentation regarding Moga-Kennedy's (as opposed to Le Chaperon Rouge's) finances. Thus, the Court has no information before it that demonstrates that Defendant Moga-Kennedy is financially unable to

---

[7] The Court further notes that, in light of the developments discussed above, Defendants could have delayed settlement proceedings, negotiated the inclusion of a *force majeure* provision in the parties' settlement agreement, or otherwise discussed provisions to address potential financial risks posed by COVID-19. Defendants failed to take any of these actions, however, and instead agreed to the terms of the settlement on the record, including the settlement payment of $200,000.

21

perform the parties' settlement agreement. To the contrary, the Declaration submitted by Moga-Kennedy regarding Le Chaperon Rouge's finances suggests the opposite. For example, Moga-Kennedy states that she owns six homes (including one in Beverly Hills and one in Naples, Florida), several of which produce rental income. (Doc. No. 87 at ¶¶ 29, 37.) She also avers that "there are several tenants in the Strongsville childcare center building who pay rent to me personally or to an entity I solely own called Stella Moga Property Management, LLC." (*Id*. at ¶ 36.) Defendant Moga-Kennedy does not indicate how much rental income she receives from these properties. Notably, she has not submitted a Declaration under oath indicating that she is personally financially unable to fund the settlement payment that she agreed to on March 12, 2020.

Accordingly, and for all the reasons set forth above, the Court finds that Defendants have failed to carry their burden of demonstrating impossibility.[8] Plaintiffs' Motion to Enforce Settlement is, therefore, granted to the extent it seeks enforcement of the parties' March 12, 2020 settlement agreement, as to both Defendant Le Chaperon Rouge and Defendant Moga-Kennedy in her individual capacity.

### B. Certification of Rule 23 Class and Approval of FLSA Collective Action and Rule 23 Class Settlements

It is undisputed that the parties' March 12, 2020 settlement agreement contemplated that the parties would jointly move the Court to (1) approve the settlement of FLSA claims and state-law wage-and-hour claims for the Plaintiffs and Opt-Ins pursuant to 29 U.S.C. § 216(b); (2) certify the proposed Settlement Class pursuant to Fed. R. Civ. P. 23; (3) preliminarily approve the settlement of

---

[8] The Court finds that an evidentiary hearing regarding the issue of impossibility is unnecessary, as resolution of this issue is determinable solely as a matter of law. *See Aro Corp*., 531 F.2d at 1372. Moreover, as noted above, Defendant Moga-Kennedy was provided the opportunity to submit an affidavit and/or documentation regarding her finances and she declined to do so. The Court will not now conduct a hearing to allow Moga-Kennedy yet another opportunity to argue this issue.

state-law wage-and-hour claims for Settlement Class Members pursuant to Fed. R. Civ. P. 23(e); (4) approve the Proposed Notice to Settlement Class Members; and (5) schedule a Fairness Hearing. *See* Doc. No. 81 at pp. 4-5; Doc. No. 82-4 at ¶¶ 20-21.

In their Motion to Enforce Settlement, Plaintiffs move the Court to issue an Order in accordance with the above and, to that end, submit the following exhibits to their Motion to Enforce: (1) a "Joint Motion for Preliminary Approval of Class and Collective Action Settlement" (Doc. No. 82-5); (2) a "Proposed Order granting Preliminary Approval of Class and Collective Action Settlement" (Doc. No. 82-8); (3) a Proposed Notice of Class and Collective Action Settlement (Doc. No. 82-6); and (4) a Class Roster (Doc. No. 82-7.)  Defendants do not address Plaintiffs' requests that the Court certify the Rule 23 class and approve the Rule 23 Class and FLSA collective action settlements.  Nor do Defendants otherwise raise any objection to the exhibits attached to Plaintiffs' Motion to Enforce.

For the following reasons, the Court grants Plaintiffs' request for Rule 23 class certification. However, due to discrepancies between the written Settlement Agreement (Doc. No.  82-4) and the "Joint Motion for Approval" (Doc. No. 82-5) and Proposed Order granting Approval (Doc. No. 82-8) regarding both the allocation of settlement funds and the amount of attorneys' fees and litigation costs, the Court will not preliminarily approve either the FLSA Collective Action or Rule 23 Class Action Settlement at this time.  Rather, the Court directs the parties to submit a revised Joint Motion for Approval and Proposed Order Granting Approval addressing the discrepancies discussed below, within 30 days of the date of this Order.

### 1. Rule 23 Certification

In their Amended Class and Collective Action Complaint, Plaintiffs seek to certify the following class under Fed. R. Civ. P. 23(a) and (b)(3):

> All teachers for Le Chaperon Rouge who were subject to the company's clocking-in, clocking-out, and health certification training practices during the period two years preceding the commencement of this action to the present.

(Doc. No. 71 at ¶ 36.)  In their Motion for Rule 23 Certification of State-Law Classes (Doc. No. 76) (which was filed on February 25, 2020), Plaintiffs explain that they seek certification of the following two sub-classes:  (1) the "Reduced-Hours Class," which consists of  teachers who were not paid for work performed before and after their paid shifts; and (2) the "Course-Attendees Class," which consists of teachers who were not paid for time spent attending sponsored health training courses. (Doc. No. 71 at pp. 1-2.)

In both their Motions for Rule 23 Certification and to Enforce Settlement, Plaintiffs assert that the proposed class satisfies Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequate representation, as well as Rule 23(b)(3)'s requirements of predominance and superiority.  (Doc. No. 71 at pp. 11-20; Doc. No. 82 at pp. 5-7.)  As noted above, the parties' March 12, 2020 Settlement Agreement included provisions for seeking the certification of Plaintiffs' Rule 23 Classes.  (Doc. No. 81 at pp. 4-5.)  Defendants have not raised any objections to Rule 23 certification.

To obtain class certification, Plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  "These four requirements—numerosity, commonality, typicality, and adequate representation—serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members." *In re Whirlpool Corp. Front- Loading Washer Products Liability Litigation*, 722 F.3d

838, 850 (6th Cir. 2013).  *See also Zehentbauer Family Land LP v. Chesapeake Exploration LLC*, 935 F.3d 496, 503 (6th Cir. 2019).

In addition to fulfilling the four prerequisites of Rule 23(a), the proposed class must also meet at least one of the three requirements listed in Rule 23(b).  *In re Whirlpool*, 722 F.3d at 850.  *See also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012).   Here, Plaintiffs seek class certification under Rule 23(b)(3), which requires the district court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members" and that the class action is "superior to other available methods" to adjudicate the controversy fairly and efficiently.[9]  *In re Whirlpool*, 722 F.3d at 850.  Plaintiffs carry the burden to prove that the class certification prerequisites are met.   *Id.*  In addition, Plaintiffs, as class representatives, are required to establish that they possess the same interest and suffered the same injury as the class members they seek to represent.  *Id.*

 "Certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (1997) (citations and internal quotation marks omitted). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'"  *Id.* at 33–34 (quoting *Wal-Mart Stores, Inc. v.*

---

[9] As the Sixth Circuit recently explained: "Rule 23(b)(3) is '[f]ramed for situations in which class-action treatment is not as clearly called for as it is in Rule 23(b)(1) and (b)(2) situations.' *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citation and internal quotation marks omitted). Courts therefore have a 'duty to take a 'close look' at whether common questions predominate over individual ones.' *Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013) (quoting *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231). 'Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.' *Amchem*, 521 U.S. at 609, 117 S.Ct. 2231. And the Supreme Court in *Comcast* similarly noted that '[t]he same analytical principles govern Rule 23(b) [and Rule 23(a)],' but 'Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).' 569 U.S. at 34, 133 S.Ct. 1426. 'What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.' *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541 (ellipsis and emphasis in original) (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009))." *Zehentbauer Family Land, LP*, 935 F.3d at 503.

*Dukes*, 564 U.S. 338, 351 (2011)). "That is so because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 34 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 351). This rigorous analysis is not, however, a "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  *See also Zehentbauer Family Land*, 935 F.3d at 503.

For the following reasons, the Court finds that Rule 23 class certification is appropriate. With regard to the first factor, numerosity, the Court finds this factor is met as to both the Reduced-Hours and Course-Attendees Classes.  To prove numerosity, a plaintiff must demonstrate that the putative class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "There is no strict numerical test for determining impracticability of joinder." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996) (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 523 n. 24 (6th Cir.1976). Although "the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative*." McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001) (quotation and citations omitted).  The Sixth Circuit has held that "'substantial' numbers of affected [class members] are sufficient to satisfy this requirement." *In re Whirlpool*, 722 F.3d at 852.

Here, the proposed settlement class consists of 746 full-time childcare staff for Le Chaperon Rouge from August 27, 2016 through April 11, 2019, whose names are listed in the Roster (Doc. No. 82-7) attached to Plaintiffs' Motion to Enforce.  (Doc. No. 82 at pp. 5-6.)  The Court finds this is adequate to show impracticability of joinder and, therefore, satisfy the numerosity requirement.  *See, e.g., Bacon v. Honda of Am. Mfg., Inc.,* 370 F.3d 565, 570 (6th Cir. 2004) (noting that the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only

factor needed to satisfy Rule 23(a)(1)") (citation omitted). *See also Taylor v. CSX Transp., Inc.*, 264 F.R.D. 281, 288 (N.D. Ohio 2007) (finding the numerosity requirement satisfied when the class definition encompassed forty individuals); *Kelly v. Montgomery Lynch & Assocs., Inc.*, 2007 WL 4562913 at *3 (N.D. Ohio Dec. 19, 2007) (finding fifty class members would be sufficient to satisfy the numerosity requirement).

The Court further finds that the second and third factors, commonality and typicality, are met with respect to both the Reduced-Hours and Course-Attendees Classes. The Sixth Circuit has explained these factors as follows:

> A class action may be maintained if "there are questions of law or fact common to the class" and the plaintiffs' claims "are typical of the claims ... of the class." Fed. R. Civ. P. 23(a)(2) & (a)(3). To demonstrate commonality, plaintiffs must show that class members have suffered the same injury. *Dukes*, 131 S.Ct. at 2551. "Their claims must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* This inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit. *Id.*
>
> Typicality is met if the class members' claims are "fairly encompassed by the named plaintiffs' claims." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir.1998) (*en banc*) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1082). This requirement insures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members. *Id.*
>
> These two concepts of commonality and typicality "tend to merge" in practice because both of them "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 131 S.Ct. at 2551 n. 5.

*In re Whirlpool*, 722 F.3d at 852-853.

Here, the Court finds that the commonality factor is satisfied. The same central legal question is at issue with respect to all members of the Reduced-Hours Class: were the class members entitled

to be compensated for time spent performing work before and after their paid shifts?[10]  Likewise, determination of the claims of the Course-Attendees class members also revolves around a common legal issue: were the class members entitled to be compensated for time spent attending the health certification training sessions required by the Defendants?[11]  Resolution of these central legal questions on a class-wide basis would "generate common answers that are likely to drive resolution of the lawsuit." *In re Whirlpool*, 722 F.3d at 852-853.  Indeed, courts have certified classes presenting similar issues of law and fact.  *See, e.g., Myers v. Marietta Mem'l Hosp.*, 2018 WL 4932087 at * 6-7 (S.D. Ohio Sept. 11, 2018) (finding commonality requirement met where plaintiffs argued that putative class members had all been injured by defendant's common policies and pay practices, including its auto-deduct lunch policy); *Hawkins v. Securitas Security Services USA, Inc.*, 280 F.R.D. 388, 393 (N.D. Ill. Nov. 16, 2011) ("Commonality is easily satisfied for the training claim, which presents the common factual question of whether Securitas required its employees to undergo training and orientation and the common legal question of whether the time spent on training and orientation is compensable...")

---

[10] More specifically, Plaintiffs assert that the following common questions are central to the claims of the Reduced-Hours class:  (1) whether Defendants knew or should have known that Class Members worked before and after their paid shifts, but still failed to compensate them in violation of Ohio law; (2) whether Defendants' policy of altering employees' timecards without giving notice to Class Members or verifying that the time shaved was not compensable working time violated of Ohio law; (3) whether Defendants violated Ohio law by failing to timely pay Class Members for all hours worked on a semi-monthly basis, and never rectifying that failure in a timely manner, as required by law; and (4) whether Defendants' policy impermissibly shifted the burden to compensate for working time from the employer to the employee. (Doc. No. 76-1 at p. 15.)

[11] With regard to the Course-Attendees class, Plaintiffs identify the following specific common questions of law:  (1) whether the health certification trainings required by Defendants constituted compensable working time; (2) whether Defendants' policy of sponsoring and mandating the training but refusing to pay employees for the training time violated Ohio law;  and (3) whether Defendants violated Ohio law by failing to timely pay Class Members for all training hours worked on a semi-monthly basis.  (Doc. No. 76-1 at p. 16.)

Moreover, the Court finds that the claims of Plaintiffs Belk and Morris are typical of the claims of the class, as both were subject to Le Chaperon Rouge's timekeeping and pay practices and challenge those practices on the basis of the same legal theories.  Successful litigation of these Plaintiffs' claims would advance the interests of all class members.  *See Young*, 693 F.3d at 542. Accordingly, the Court finds that the commonality and typicality requirements are satisfied.

As to adequacy of representation, the Court considers two factors: "(1) The representative must have common interests with the unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter*, 532 F.2d at 525. *See also Young*, 693 F.3d at 543; *Kritzer v. Safelite Solutions, Inc*., 2012 WL 1945144 at * 4 (S.D. Ohio May 30, 2012).  Adequate class representation is essential due to the preclusive nature of a class action judgment. *See Elkins v. American Showa, In*c., 219 F.R.D. 414, 419 (S.D. Ohio 2002).

Both prongs appear to be satisfied here, as the representative Plaintiffs share with the rest of the class the desire to obtain compensation for the uncompensated time at issue in this case.  The Court is also aware that counsel of the Plaintiff class has considerable experience litigating wage and overtime class actions.  Plaintiffs' counsel has pursued vigorously the claims in this action, further demonstrating adequate representation of not only the class representatives but the class as a whole. Accordingly, the Court finds the fourth factor, adequacy of representation, to be satisfied.

Having found the prerequisites of Fed. R. Civ. P. 23(a) to be met,[12] the Court must next determine whether the proposed class action fits under one of the categories specified in Rule 23(b).

---

[12] In addition to the requirements of Rule 23(a), the Sixth Circuit in *Young, supra*, also adopted an "ascertainability" requirement, finding that certification necessitated "a class description [that is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Young*, 693 F.3d at 538;

Here, Plaintiffs invoke Rule 23(b)(3), which allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Informing the Court's determination on this issue are several factors, including (a) the class members' interests in individually controlling the prosecution or defense of separate actions, (b) the extent and nature of any litigation concerning the controversy already begun by or against class members, (c) the desirability or undesirability of concentrating the litigation in the particular forum, and (d) the likely difficulties in managing the class action.  *See* Fed. R Civ. P. 23(b)(3)(A) - (D).

The predominance inquiry under Rule 23(b)(3) focuses on whether the proposed class is "sufficiently cohesive" to warrant class action treatment.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  As the Supreme Court has explained, this inquiry must focus on common questions that can be proved through evidence common to the class.  *Amgen Inc*, 568 U.S. at 466-467.   A plaintiff class need not, however, prove that each element of a claim can be established by classwide proof: "What the rule does require is that common questions 'predominate over any questions affecting only individual [class] members.'" *Id.  See also In re Whirlpool*, 722 F.3d at 858; *Powers v. Hamilton Cty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir.2007).   In this case, the only individualized questions appear to be the specific number of hours that the putative class members were allegedly required to work off the clock.  Specifically, Plaintiffs assert (and Defendants do not contest) that no individual issues predominate because all class members were subjected to the

---

*see also Rikos v. Procter & Gamble Co*., 799 F.3d 497, 524–26 (6th Cir. 2015). Here, the Court finds the Reduced Hours and Course-Attendees classes are sufficiently definite and, therefore, satisfy this requirement.

Defendants' policies of not paying for work performed before and after paid shifts, or for time spent attending health certification training programs.  Accordingly, this Court finds the predominance requirement of Rule 23(b) satisfied.

The Court also finds that the class action is the "superior" method of adjudicating the controversy here.  The wages at issue on the individual class member level are likely to be relatively small, undercutting the individual class members' interests in pursuing their own separate actions.  Moreover, there is a strong interest in prosecuting the claims in one forum. *See Kritzer*, 2012 WL 1945144 at * 4.  Finally, the Court is not aware of any other actions that have been brought by individual members of the putative class, nor does it find undue difficulties in managing the putative class.

Accordingly, and for all the reasons set forth above, Plaintiffs' request that the Court grant Rule 23 Class Certification is granted.

### 2.    Approval of FLSA Collective Action and Rule 23 Class Action Settlements

Finally, Plaintiffs ask the Court to approve the parties' FLSA Collective Action settlement, preliminarily approve the Rule 23 Class Action settlement, approve Notice to Settlement Class Members, and schedule a Fairness Hearing.  (Doc. No. 82 at pp. 7-12.)  For the following reasons, the Court declines to do so at this time due to discrepancies between the written Settlement Agreement (Doc. No. 82-4), "Joint Motion for Approval" (Doc. No. 82-5), and Proposed Order granting Approval (Doc. No. 82-8) regarding both the allocation of settlement funds and the amount of attorney fees and litigation costs.

As discussed above, the parties agreed to a Total Settlement Payment by Defendants of $200,000.00.  The Settlement Agreement attached to Plaintiffs' Motion to Enforce provides for allocation of this amount as follows:

23. **Collective and Class Payments**. The Total Settlement Amount, after deduction of the Service Awards, Attorneys' Fees, and Reimbursed Litigation Costs, will constitute the Net Proceeds of the Settlement. The Net Proceeds will be allocated to the Plaintiffs, Opt-Ins, and Settlement Class Members in Individual Payments as provided below.

24. **Method of Allocation**. *One-third of the Net Proceeds will be paid to the Plaintiffs and Opt-Ins in settlement of their FLSA claims and state-law wage-and-hour claims*, as provided herein. The remaining *two-thirds of the Net Proceeds will be paid to Settlement Class Members* (other than the Plaintiffs and Opt-Ins and not including persons who request exclusion from the Settlement Class in accordance with the Notice) in settlement of their state law wage-and-hour claims, as provided herein. All Collective and Class Payments will be further allocated among recipients in proportion to their [either hours reduced or weeks worked]. A proposed Table of Individual Payments will be submitted to the Court with the Parties' proposed Final Order.

(Doc. No. 82-4 at ¶¶ 23, 24) (emphasis added). The Agreement provides for service awards to Plaintiffs Briana Belk and Tiffany Morris in the amount of $3,000 each, as well as attorneys' fees in the amount of $66,000.00 plus reimbursement of litigation costs in the amount of $9,630.10, payable to Plaintiffs' counsel. (*Id*. at ¶¶ 25, 26.)

However, the draft Joint Motion for Preliminary Approval of Class and Collective Action Settlements attached to Plaintiffs' Motion states that fifteen percent of the Net Proceeds will be paid to Plaintiffs and the Opt-Ins in settlement of their FLSA and state-law wage and hour claims, and eighty-five percent will be paid to the Settlement Class Members. (Doc. No. 82-5 at p. 5.) Additionally, the draft Joint Motion provide for attorneys' fees in the amount of $65,000.00 and reimbursement of litigation costs in the amount of $11,030.10. (*Id*. at p. 6.)

The Proposed Order granting Approval of Settlements attached to Plaintiffs' Motion is consistent with the Settlement Agreement, providing for the payment of one-third of the Net Proceeds to Plaintiffs and the Opt-Ins in settlement of their FLSA and state-law wage and hour claims, and the remaining two-thirds to the Settlement Class Members. (Doc. No. 82-8 at p. 3.) The Proposed Order

does not, however, include the amount allocated for attorneys' fees and/or reimbursement of litigation costs.

The Court is not inclined to approve the parties' settlements or issue Notice until these discrepancies are resolved. The Court hereby directs the parties to submit a revised Joint Motion for Approval and Proposed Order Granting Approval addressing the discrepancies discussed above, within 30 days of the date of this Order.

## III.  Conclusion

For all the reasons set forth above, Plaintiffs' Motion to Enforce Settlement (Doc. No. 82) is GRANTED IN PART and DENIED IN PART, as follows.  Plaintiffs' Motion is GRANTED to the extent it seeks enforcement of the parties' March 12, 2020 settlement agreement, as to both Defendant Le Chaperon Rouge and Defendant Moga-Kennedy in her individual capacity.  Plaintiffs' Motion is also GRANTED to the extent it seeks Rule 23 Class Certification, as set forth above.

Plaintiffs' Motion is DENIED at this time to the extent it seeks (1) approval of the settlement of FLSA claims and state-law wage-and-hour claims for the Plaintiffs and Opt-Ins pursuant to 29 U.S.C. § 216(b); (2) preliminary approval of the settlement of state-law wage-and-hour claims for Settlement Class Members pursuant to Fed. R. Civ. P. 23(e); (3) approval of the Proposed Notice to Settlement Class Members; and (4) an Order scheduling a Fairness Hearing.  The parties are ordered to submit a revised Joint Motion for Approval and Proposed Order Granting Approval addressing the discrepancies discussed in this Memorandum Opinion & Order, within 30 days of the date of this Order.

**IT IS SO ORDERED.**

_s/Pamela A. Barker_
PAMELA A. BARKER
Date:  July 6, 2020                                              U. S. DISTRICT JUDGE

33